DECISION
Before this Court is an appeal from a decision of the Town of Little Compton Zoning Board of Review (Board). Plaintiff Stanley Wallack (Wallack) seeks reversal of the Board's decision of September 23, 2002, granting a building permit to defendants Peter and Gail Lozier to construct a large building on their property. This Court has jurisdiction pursuant to G.L. 1956 § 45-24-69.
 FACTS AND TRAVEL
On July 23, 2002, the Town of Little Compton building official (building official) issued a building permit to the defendants, Peter and Gail Lozier (Loziers). The permit allowed them to build a large structure having dimensions of 84 feet in length, 28 feet in width, and 30 feet in height on their property. The structure was proposed, in part, to be a horse stable. The Loziers proposed the structure to be built 26.5 feet from the property line they share with Wallack. Wallack appealed the issuance of the permit to the Board, which heard the matter on September 18, 2002. Wallack contended that this behemoth — like structure would amount to a second principal structure on Loziers' lot rather than an accessory structure and, therefore, would be a violation of § 14-1.3(b) of the Little Compton Zoning Ordinance (Ordinance), which prohibits more than one principal structure per lot. Wallack also argued that the true nature of the proposed structure is not agricultural and, accordingly, its height should be limited by § 14-4.1, which imposes a 24-foot maximum height limitation for general accessory structures as opposed to the increased height allowance for barns, silos and other agricultural structures.
The Board rendered a written decision on September 23, 2002, denying Wallack's appeal. The Board concluded that the proposed structure is an accessory structure. It also concluded that the structure qualifies for the 30 feet height allowance set out in § 14-4.1 for "accessory barns, and other agricultural structures." Although it denied Wallack's appeal, the Board went on to impose special conditions on Loziers' use of the structure.
Wallack filed a timely appeal to this Court and, on October 21, 2002, presented the Court with motions for temporary restraining order and preliminary injunctive relief. After a conference with the Court, Wallack agreed to continue those motions pending this Court's opportunity to review the record of the Board. On March 14, 2003, this justice granted Wallack's request for a preliminary restraining order after making the necessary interlocutory findings of fact and conclusions of law.
 Standard of Review
The standard of review for this Court's appellate consideration of the zoning board's decision is outlined in G.L. 1956 § 45-24-69(D), which states:
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing a zoning board decision, this Court must examine the entire certified record to determine whether substantial evidence exists to support the finding of the board. Salve Regina College v. Zoning Bd.of Review, 594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v. Zoning Bd.of Review of Warwick, 405 A.2d 1167, 1170 (1979)); Restivo v. Lynch,707 A.2d 663 (R.I. 1998). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means in amount more than a scintilla but less than a preponderance." Caswell v. George Sherman Sandand Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981) (citing Apostolou v.Genovesi, 388 A.2d 821, 825 (1978)). The essential function of the zoning board is to weigh evidence, with discretion to accept or reject the evidence presented. Bellevue Shopping Center Associates v. Chase,574 A.2d 760, 764 (R.I. 1990). Moreover, this Court should exercise restraint in substituting its judgment for that of the zoning board and is compelled to uphold the board's decision if the Court can "conscientiously find" that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey, 495 A.2d 257 (R.I. 1985) (quoting Apostolou, 388 A.2d at 825).
 ANALYSIS
The evidence before the Board included building and site plans and renderings. The building plans depict a very large structure, having dimensions of 84 feet in length, 28 feet in width, and 30 feet in height. The plans and renderings depict a structure having the outward appearance of that which the average person would think of when asked to imagine a barn found on a farm or used in farming operations. The plans also depict two floors of full height, and a firewall dividing the eastern one-third of the building from the other two-thirds. The area on the first floor, to the east of the firewall, is designated for use as a horse stable. The area above that, on the second floor, is designated as an attic. The horse stable comprises about 1/6 of the structure's total floor space. Except for an area on the first floor that bears no use designation, the rest of the structure is designated as studio or workshop areas. No plumbing plan is shown. The plans indicate that the partitions and stalls comprising the interior of the horse stable would not be installed when the structure was initially constructed.
The building official testified at the hearing before the Board. He testified that he issued the permit because, in his opinion, the structure is properly classified as an accessory use under the ordinance and is permitted by § 14-3 Table 1-B of the Ordinance. The gist of his testimony was that, except for lot coverage and height, the Ordinance imposes no limits on the size of an accessory structure as long as it can be used for activities that are regarded as incidental to the principal use. According to the building official, due to the amount of acreage that the Loziers have, the Ordinance permits them to build an accessory structure of up to 200,000 square feet provided they conformed to wetlands regulations and the like. Zoning Board of Review Transcript. (Tr. at 23, 36-38). He also testified that a property owner could erect any number of accessory structures as long as the lot size requirements were not exceeded. Id. Additionally, the building official testified that, in his estimation, a barn is not necessarily an agricultural structure. He testified that a barn can be any "big building that houses stuff" and that such storage barns are accessory structures under the Ordinance. (Tr. at 26.) He went on to testify that for such accessory barns — big buildings that house stuff — the dimensional regulations found in § 14-4 allow a height of 30 feet. The building official also testified that the presence of a horse stable in the proposed barn also made it an agricultural structure for which a height of 30 is allowed. Id. He testified that even if the Loziers' proposed structure were not to be used for agricultural purposes, he would still write a building permit for the height allowance. (Tr. at 29, 36-38) The building official agreed that there are no farming or agricultural activities presently carried on anywhere upon the Loziers' property. (Tr. at 27.)
Peter Lozier testified before the Board. He testified that when he purchased the property, he had in mind a long term plan for developing the property, which included the construction of a combination garage and guest house. (Tr. at 60.) He testified that his plans changed and he decided to build a barn. (Tr. at 61.) A reason for building the structure, he stated, was to screen the view of the Wallack's newly constructed house. Id. According to Lozier, he had attempted unsuccessfully to buy Wallack's property from Wallack. Id. He also testified that he, personally, dislikes horses and that the horse stable would be for the use of his daughter and her children who would keep their riding horses there during the summer months. (Tr. at 64.) He did not say at what point in the future that might occur.
Lozier equivocated concerning his intended use of the structure. He testified that his wife was a sculptor but also testified that he was uncertain about the use to which the area denominated on the plans as a studio would be put. (Tr. at 63.) He equivocated about using that area for furniture storage and, ultimately, stated he did not know what he would use it for. Id. He did, however, state that he needed a portion of the building to store his boat and a tractor, and that storing the boat required eight feet in height. (Tr. at 62.) He admitted that it was the architect who designed the structure who caused the areas on the plan to be denominated as they are denominated — studio and workshop. (Tr. at 63.)
Allen Berry, the architect who designed the structure, testified that the design of the barn is compatible with the character of the community. He also testified about alternative locations for the barn.
There is no dispute that the current principal use of the Loziers' property is residential (#R1) and is one of several permitted principal uses outlined in § 14-3 Table 1 — A of the Ordinance. Although the Ordinance permits Agricultural Fishing uses and Open Space riding stables as principal uses in residential zones, it is undisputed that neither classification applies to Loziers' property and that Loziers do not carry out any form of agricultural activities on their property.
Two primary questions are presented to the Court. The first is whether the Board erred in determining that the structure and the activities to be conducted within it are accessory as defined by the Town of Little Compton Zoning Ordinance. The second question is whether the Board erred in determining that the proposed use of the structure is such that it qualifies for the 30 foot height allowance.
 Is the Proposed Use/Structure an Accessory Use/Structure?
In order to determine whether or not the Board erred in determining that the subject structure and the activities to be conducted therein are accessory, it is first necessary to understand what criteria the ordinance requires for accessory uses and accessory structures. Section 14-10 of the Ordinance contains a general definition of accessory uses and structures. That section dictates that unless a contrary meaning is specifically prescribed, the definitions contained in § 14-10 shall control. (Ordinance at § 14-10.) An accessory use or structure is defined as a "use or structure clearly accessory or incidental to the principal use of a lot or structure and located on the site of the principal structure." Id. Included among the examples listed are barns, carports and sheds. Id. Thus, the general definition, though seemingly redundant, requires that the accessory structure or use be patently accessory, that is, is one that plainly and unmistakably stands as secondary, subordinate or attendant to the predominate use or structure on the lot.[1] Id. Therefore, determining whether an activity is an "`incidental' use is a fact-dependent inquiry, which both compares the effect of the incidental use to that of the primary use and evaluates the reasonableness of the relationship between the incidental and permissible primary use." Henry v. Board of Appeals of Dunstable , 418 Mass. 841, 845, 641 N.E.2d 1334, 1336 (1994).
Apart from the general definition of accessory uses and structures found in § 14-10, §§ 14-3.1(b) and 14-3 Table 1-B-Table of Accessory Use Regulations — govern the zoning district requirements that must be uniformly applied to each class or kind of structure or land. §§ 14-1.3, 14-3.1(b) and 14-3 Table 1-B. Section 14-3.1(b) leads with the directive that Table 1-B is designed to regulate accessory uses. § 14-3.1(b). For purposes of applying the zoning district requirements, § 14-3.1(b) defines accessory uses as "any use of land or of a building (or a portion thereof) that is customarily incidental to and subordinate to the principal use of the land or building" and continues with language reflecting the ordinance's prohibition against more than one main or principal building, together with its accessory buildings or uses, on one lot. §§ 14-1.3(b), 14-3.1(b). Section 14-3 Table 1-B establishes specific regulations for different types of accessory structures and activities. In a residential zone, certain accessory structures and activities are permitted as a matter of right. § 14-3 Table 1-B. These are structures and activities which can be classified as Accessory Use #1 under the ordinance. § 14-3 Table 1-B. Structures and activities which can be classified as Accessory Use #1 are structures and activities "normally accessory to and required for the operation of a permitted use." § 14-3 Table 1-B. The regulation contains the caveat that such accessory uses and structures shall be located on the site of the principal use and allows that accessory uses and structures may include such items as parking facilities, agricultural buildings, sheds, garages and similar uses and structures. Plainly, § 14-3 Table 1-B, taken together with § 14-3.1, requires that, in order for structures and activities to qualify as accessory uses permitted as a matter of right in a residential district, it must be demonstrated that they meet two criteria. First, that under normal or ordinary circumstances, the structure and activity must be customarily attendant to the predominant and permitted use and, second, that the structure and activity are required for the operation of the predominant and permitted use. For residential districts, the § 14-3 Table 1B classifications prohibit accessory structures and activities that do not meet these criteria or they allow them by special permit only.
When §§ 14-10, 14-3.1(b) and the § 14-3 Table 1-B regulations are taken together, it becomes apparent that the elements or criteria required by §§ 14-3.1 and 14-3, Table 1 — B must be clearly demonstrated before a structure and the activities to be conducted within it can be considered accessory. Therefore, in determining whether the structure or use in question falls within the ordinance's criteria as accessory, the building official or Board is required to consider and determine whether the structure and the activities to be conducted in it clearly are, under normal or ordinary circumstances, customarily attendant to the existing[2] predominant and permitted use. Thus, the use "`must not only be "incidental" but must also be "customarily conducted" with respect to the primary use.'" LaMontagne v. Zoning Boardof Review of City of Warwick, 95 R.I. 248, 250, 186 A.2d 239, 240 (1962) (quoting Gold v. Zoning Board of Adjustment, 393 Pa. 401,404, 143 A.2d 59
60) (the Rhode Island Supreme Court found here that the use of a basement for a beauty salon in a residential dwelling was not a use "incidental and customarily associated with a home use" to constitute a reasonable accessory use). If this determination is affirmative, the building official or Board must next consider and determine whether both the structure and the activities to be conducted in it clearly are required[3] for the operation of that use. See Town ofNorth Kingstown v. Albert, 767 A.2d 659, 654 (R.I. 2001) (the creation of an irrigation pond is a necessary and accessory use to a farming operation) (emphasis added).
It is well-settled that the rules of statutory construction apply to the interpretation of ordinances. Id. (citing Mongony v. Bevilaqua,432 A.2d 661, 663 (R.I. 1981) "By examining a statute in its entirety and giving the words their plain and ordinary meaning," this Court can discern the legislative intent of an ordinance. Parkway Towers Associatesv. Godfrey, 688 A.2d 128 (quoting In re Falstaff Brewing Corp.,637 A.2d 1047, 1049 (R.I. 1994)). It seems plain enough that the purpose behind the language of the Ordinance and the analysis it triggers is to ensure that the building official and the Board examine and pass upon the true character or substance of the proposed accessory structure. It is also plainly evident that the Ordinance requires that the accessory nature of the proposed structure be clear. Plainly, this requirement was intended to avoid situations in which an individual is permitted to build a structure of any nature or character merely by using the simple expedient of denominating it as, say, a garden shed or a carport or, as in this case, a barn and by staying within the applicable dimensional requirements.[4] By following the § 14-10 general definition in conjunction with the §§ 14-3.1 and 14-3 Table 1-B zoning district regulations, the building official or Board can go about the task of considering (1) how both the activity and structure relate to the existing principal use and (2) the relationship between the activities and the structure, or, in other words, the extent to which the structure is needed to support the activities anticipated to be carried out within it.
The evidence before the Board in this case was that the existing principal use of the property is residential only. Therefore, to satisfy the first element or criteria required by §§ 14-3.1 and 14-3, Table B1, Loziers were required to show that the proposed structure and the activities to be conducted therein are, under normal or ordinary circumstances, clearly of the type that customarily attend his use of the premises. Other than Peter Lozier's testimony that he would store a boat and tractor in an area amounting to 1/6 of the structure and horses in another 1/6, there was a dearth of evidence concerning the activities that would actually be conducted in the balance of this vast structure. Parts of Lozier's testimony were vague and equivocal. He remained non — committal about his plans for the structure. At one point he specifically stated that he did not know for what activities he would be using the structure — other than part-time horse keeping and boat and tractor storage in about one-third of it. And, contrary to the Board's finding, he did not testify that he planned to use the structure for his workshop. See Zeilstra v. Barrington Zoning Bd. of Review,417 A.2d 303 (R.I. 1980) (though a garage was a permitted accessory use under the ordinance, the evidence before the zoning board indicated that the petitioner designed and intended to use his structure for a purpose — possibly a hobby-shop or a recreation room — other than for a garage, warranting denial of relief). Even giving the Board credit for knowing what activities or uses are, under normal or ordinary circumstances, typical or customary of Little Compton residences like Lozier's, it is clear to this Court that the Board lacked the necessary evidentiary basis to support a finding that this particular structure, as a whole, and the overall use to which it would be put would be, under normal or ordinary circumstances, customarily attendant to the residential use of the property — and clearly so.
"An owner bears the burden of proving that his or her property use meets the definition of an accessory use." E.C. Yokely, Zoning Law andPractice, § 8-3 (4th ed. 2001). While it is true that boat and tractor storage, art studios, and workshops and the structures necessary to house them, under certain circumstances, could be viewed as customarily attendant to a residential use, Loziers were unwilling or unable to make a commitment that those indeed would be the uses to which this structure would be put. Therefore, the Board lacked substantial evidence concerning the true nature of the activities that would be carried out within most of the structure. Thus Loziers failed to demonstrate that the true character of the structure and the activities to be carried out therein are clearly accessory as required by § 14-10 of the ordinance. Accordingly, the Board erred in finding they had done so.
With respect to the second element or criteria for an accessory structure or use, Loziers were required to demonstrate and the Board was required to find that this particular structure and the activities to be carried out in it clearly were required for the operation of the existing permitted use. As indicated previously, Peter Lozier testified that he personally disliked horses and that any horses to be stabled on the property would not be for the Loziers' use but, instead, would be for the use of his adult daughter who does not make her residence in the premises. He also testified that a use of the proposed structure was to block the view of the Wallack property. Other than for the latter purpose, the true character and the true nature of the bulk of the structure remained a mystery. And, although under certain circumstances, boat and tractor storage could be viewed as required for the operation of a residential use, the area proposed to be put to that use represents a small portion of the building. Therefore, the Board lacked (1) substantial evidence concerning the true nature of the activities that would be carried out within most of the structure and (2) substantial evidence to support a finding that any such activities were required for the operation of the permitted use. Furthermore, there was no evidence that a structure of this size was required to accommodate the anticipated activities — whatever they might be. Thus, Lozier failed to demonstrate that the structure, as he proposed to build it, was required to accommodate some use or activity that was clearly accessory.
It is this Court's conclusion that the Board's decision was clearly erroneous in view of the reliable, probative and substantial evidence of the whole record. It is also this Court's conclusion that the Board's decision was affected by error of law in that it failed to apply the Ordinance's requirements for accessory structures and uses. Furthermore, and to the extent that the Board may have determined, as did the building official, that a structure having the design aesthetics of a barn or which can be used for storage necessarily qualifies the structure as an accessory structure, the Board erred as a matter of law in failing to consider and apply the ordinance's requirements or criteria for accessory uses and for accessory structures. Finally, it is this Court's conclusion that the Board abused its discretion in allowing this large structure, a structure that was legally and factually not justified as an accessory structure, to be built and to be built, as proposed, where its presence potentially would have a substantial impact on the neighboring property.
 Is the Proposed Structure a Barn or Other Agricultural Structure?
The Board also approved the building official's allowance of a 30 foot maximum height for the structure. The next question is whether the building official and Zoning Board erred in determining that the proposed structure qualifies for such a maximum height allowance due to the structure's barn-like appearance and the presence of a horse stable in a small portion of it.
Section 14-4 of the ordinance, entitled Dimensional Regulations, limits the height of accessory structures to 24 feet. An exception is created for barns, and other agricultural structures, which are allowed a maximum height of 30 feet. In its decision, the Board concluded that the § 14-4.1 language of exception extends to barns that are not used primarily for agricultural purposes. Seemingly, the Board agreed with the building official that a barn can be any building used for storage purposes and, as such, it qualifies for the additional height allowance, or the Board took the language of § 14-4 to mean that the height allowance extends to structures having the outward appearance of a barn regardless of the true nature of its use. The Board also determined (1) that the stabling of horses is an agricultural use and (2) the fact that the stables will make up some portion of the structure qualifies the structure for the height allowance.
It should be evident that it is the true nature and character of a structure, not merely its style or design, which controls whether the structure is an agricultural structure. Zeilstra v. Barrington ZoningBoard of Review et al., 417 A.2d at 308. Necessarily, in order to determine the true nature and character of a structure, one must consider the activities and uses that will be carried out therein. Merely because a structure is styled as a barn, silo or other agricultural structure does not mean that it is truly agricultural in character. Therefore, the question for the building official and the Board in this case was whether the activities to be carried out in the structure were such that the structure could be fairly characterized an agricultural structure — irrespective of its outward appearance.
The Ordinance does not contain a definition of agriculture. Although a zoning board may be given "wide discretion to construe an ordinance where terms [are]`inadequately defined,'" (citations omitted), the court will attach "great weight to each example of an accessory use in an ordinance." Hein v. Town of Foster Zoning Bd. of Review, 632 A.2d 643, 645-46 (R.I. 1993). The Ordinance use tables provide some guidance concerning the question. Section 14-3 Table 1-A of the Ordinance lists agricultural and fishing as principal uses. For each agricultural use classification, the contemplated uses are product-oriented and include the growing, processing, value added production of agricultural products, pig raising, and aquaculture based harvesting and processing. Such uses comport with the widely held definition of agriculture which "generally, in its broad sense, is said to be "`the art of science of cultivating the ground, including harvesting of crops and rearing and management of livestock.'" Farmegg Products, Inc. v. Humboldt County,190 N.W.2d 454, 457-58 (Iowa 1971) (quoting 3 C.J.S., Agriculture, § 1, page 365). Similarly, Black's Law Dictionary defines agriculture as "the science or art of cultivating the soil, harvesting crops, and raising livestock and also the science or art of the production of plants and animals useful to man and in varying degrees the preparation of such products for man's use and their disposal." Black's Law Dictionary 68 (6th ed. 1990). Similarly, too, the United States Department of Agriculture defines a barn as
 "a building (other than a dwelling) on a farm, ranch, or other agricultural operation for — (A) housing animals; (B) storing or processing crops; (C) storing and maintaining agricultural equipment; or (D) serving an essential or useful purpose related to agricultural activities conducted on the adjacent land."
Farm Security and Rural Investment Act, 7 U.S.C. § 2008o (a)(1) (2003). Not only are both of these definitions consistent with the description of agricultural uses described in § 14-3 Table 1-A, they are consistent with the manner in which the ordinance classifies riding stables. The ordinance does not classify riding stables as an agricultural use. Table 1-A classifies riding stables as an open space use. Thus, the drafters of the Ordinance seemingly recognized the distinction between true agriculture and the sports activity of horseback riding and other activities pursued by what is often referred to as the "gentleman farmer' who enjoys the rural or agricultural environment and associated activities but who does not engage in agriculture. Furthermore, though the Rhode Island State Building Code defines an agricultural building as "[a] structure utilized to store farm implements, hay, feed, grain, or other agricultural or horticultural products or to house poultry, livestock, or other farm animals," the Code also mandates that agricultural structures shall not include habitable or occupiable spaces. Rhode Island State Building Code § 202.0 at 9
The plain, ordinary and common sense interpretation of § 14-4.1 is that the height allowance is intended for agricultural buildings including barns of the agricultural variety. That is, barns primarily dedicated to agricultural uses. Plainly, the § 14.4-1 reference to barns and silos means something more than a large building designed to mimic the appearance of barns or silos ordinarily associated with farms and agricultural uses. It is plain enough, too, that the phrase, "other agricultural structures," modifies the phrase "accessory barns." This interpretation comports with the Ordinance which sets forth as one of its purposes, "providing for the preservation and promotion of agricultural production, forest, silviculture, aquaculture, timber resources and open space." § 14-1.2(f). Furthermore, § 2.3a(d) of the Comprehensive Plan sets forth as one of the primary goals of the land use element to "[p]reserve and enhance rural and agricultural areas." Little ComptonComprehensive Plan § 2.3a(d) (1994). The Comprehensive Plan also recognizes "farming [and] agriculture . . . are traditional, local activities which provide economic, visual and ecological benefits to the community." Id. At § 4.4. The Zoning Enabling Act of 1994 unequivocally provides that in resolving any uncertainty in the interpretation of a zoning ordinance, the ordinance must be construed to further the objectives of the comprehensive plan. G.L. 1956 § 45-24-34. To interpret the phrase "barns and other agricultural structures" to mean any large storage building having the aesthetic features of an agricultural barn but which is not truly and substantially dedicated to agricultural purposes defies common sense and is in conflict with the goals of the comprehensive plan and intent of the ordinance. So, too, such an interpretation would render the 24 foot maximum height allowance nearly meaningless — a property owner would only need style a structure as a barn, chicken coop, tractor shed, corn crib or a silo to trigger the 30 and 50 foot height allowance exceptions found in § 14.4-1.
Although the evidence showed that horses would be stabled in the structure, the evidence was also clear that they would not be used for product-based purposes. "A riding stable is not [considered] an agricultural use . . . ." Anderson's American Law of Zoning, § 9.47 (4th ed. Young 1996). The evidence here was that the horses were to be stabled and used for sports and leisure purposes by individuals residing off the premises.[5] Additionally, the physical area of the stable, consisting of stalls and hayloft, would occupy only one-sixth to one-third of the structure. Furthermore, the evidence showed that as much as half of the building might be occupied, albeit the Loziers' non-committal stance about the activities they intend to carry out within much of the structure makes it hard to tell precisely how much of the structure indeed might be occupied. Therefore, the record did not contain substantial evidence to support the Board's conclusion that the structure or the activities to be conducted therein were truly agricultural in character.
It is this Court's conclusion that the Board's decision that the proposed structure was an agricultural structure was clearly erroneous in view of the reliable, probative and substantial evidence of the whole record and in violation of ordinance provisions. It is also this Court's conclusion that the Board erred, as a matter of law, in determining that the test for an agricultural structure is the structure's appearance. The Board also erred in determining the test to be whether an agricultural activity is carried out in some portion of the structure and not whether the true or fundamental character of the structure and the activities to be carried out in it are agricultural. Furthermore, the Board erred, as a matter of law, in determining that a riding stable is an agricultural activity.
 Conclusion
For the foregoing reasons, the plaintiff's complaint and appeal are sustained, and the decision of the Zoning Board is reversed. Substantial rights of the appellant have been prejudiced. The building permit issued to Peter Lozier and Gail Lozier is ordered revoked. Because the Court deems a permanent injunction to be unnecessary given the within decision, the plaintiff's prayer for relief in that regard is denied.
[1] Although the standard to be applied by the Superior Court in ruling on an appeal from a decision of a zoning board is one of `substantial evidence,' there is no prohibition against a municipality enacting an ordinance provision requiring that, in order for a structure or use to be allowed under the ordinance, the nature of that proposed structure or use must clearly be what it is purported to be.
[2] This justice uses the term, "existing," because it notes that § 14-10 of the ordinance speaks in terms of "the principal use" and not "a permitted use." Plainly, the question must be whether the proposed structure or activity is normally attendant to and required for the operation of the principal use that currently exists. It would make no sense to allow structures or activities that are normally accessory to and required for the operation of a use that is permitted in the district but is, nevertheless, not the principal or predominant use of the lot in question. This Court's reading of the ordinance is that the term "permitted use" in the § 14-3 Table 1-B Use #1 classification is used to distinguish uses allowed as a matter of right versus those allowed by special use permit or which are non-conforming. The Accessory Use #1 classification does not allow accessory structures or activities that are normally accessory to and required for the operation of a specially permitted use or a non-conforming use.
[3] Reasonably required, essential or necessary to its enjoyment as opposed to absolutely required, essential or necessary to its existence.
[4] The building official mistakenly believed that Lozier was entitled, as a matter of right, to erect a structure of up to 200,000 square feet so long as it looked like a barn or could be called a storage barn.
[5] One court, in reference to a stable sought as an accessory use to a dwelling, mused:
 "But when we begin to deal with a stable, especially since it involves a building on the land which is not a dwelling house, we must consider in what direction are we being led? Could [the petitioner] build a cow barn and keep a couple of cows for family use?" Pratt v. Building Inspector of Gloucester, 330 Mass. 344, 346, 113 N.E.2d 816, 817 (Mass. 1953).
The Pratt Court noted that the test to determine whether the structure would constitute an accessory use was "whether the use is one that is so necessary in connection with a one family detached house or so commonly to be expected with such a house that it cannot be supposed the ordinance was intended to prevent it." Id.